**FILED**

**JUNE 17, 2011**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARICEL O. EUSEBIO,** | ) |
| **Plaintiff,** | ) Case No. 11-cv-00811 |
| **v.** | ) Hon. Robert M. Dow, Jr. |
| **NIZAR ASSAF and NANA ASSAF,** | ) JURY TRIAL DEMANDED |
| **Defendants.** | ) |

## AMENDED COMPLAINT

Plaintiff Maricel Olivera Eusebio ("Eusebio"), for her complaint against Nizar Assaf and Nana Assaf (collectively "the Assafs"), states as follows:

### THE PARTIES

1.      Plaintiff Maricel Olivera Eusebio is a citizen of the Philippines. She currently resides in the United States pursuant to a T Visa, a visa available only for victims of human trafficking.

2.      Upon information and belief, the defendants, Nizar Assaf and Nana Assaf, were at all times relevant to this Complaint a married couple residing at 10561 Bloomfield Drive in Palos Park, Illinois. Upon information and belief, Nizar Assaf is a citizen of Jordan and Nana Assaf is a citizen of the United States of America.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the defendants are residents of Cook County and the events complained of took place in Cook County.

## STATEMENT OF FACTS

5.      This case involves the economic exploitation of an impoverished Filipino woman. The defendants took advantage of her poverty to turn her into their personal servant, on call 24 hours a day, seven days a week, at their home in Palos Park, Illinois. Ms. Eusebio was continually at the Assafs' beck and call for the three years she worked for the defendants. In exchange, Eusebio was initially paid only $300 a month – less than $1 per hour. This compensation was later raised to $400 a month and later to $500 a month -- still less than $2 per hour.

6.      The defendants led Ms. Eusebio to believe she could not work elsewhere without facing arrest and/or deportation and thus suffering the significant harm of no longer providing for her four children in the Philippines. Accordingly, the defendants manipulated Ms. Eusebio so she believed she had no choice but to continue to work for the defendants until she was rescued by law enforcement officials in December 2009.

## I.      Ms. Eusebio travels from the Philippines to Jordan seeking work to support her impoverished children, 2005-2006

7.      Ms. Eusebio was born in Lucena City, Philippines on July 28, 1976. She went to school until tenth grade and never completed high school. She met her future husband, Riant Eusebio, at age 18, and together the couple had four children. Riant Eusebio was habitually unemployed and the family was desperately poor as a result. Ms. Eusebio, her husband, and her four children lived in a one-room house, with all six family members sharing a bed. Ms. Eusebio routinely had to resort to charity in order to feed her children.

2

8.     Shortly after the birth of her fourth child, Ms. Eusebio decided that she needed to take drastic action to be able to support her children. Unable to find a good-paying job in the Philippines, Ms. Eusebio determined to find work abroad. In 2005, she contacted the CLA International Manpower Agency ("CLA") to apply to work as a domestic worker overseas.

9.     In late 2005, CLA informed Ms. Eusebio that it had found work for her in Jordan. She left the Philippines for Jordan on December 24, 2005.

10.     CLA's operations in Jordan were carried on in an atmosphere of violence, intimidation, and exploitation. CLA charged a placement fee of three months' salary, so for three of the months Ms. Eusebio worked in Jordan, she received no pay. She worked as a domestic servant for several employers in Jordan. In between the times of her employment, Ms. Eusebio and other domestic workers were housed in a small room at a Jordanian employment agency, where they were locked in at night and only given one meal a day. On one occasion, Ms. Eusebio witnessed an agency boss push and slap a worker because he was angry that the worker had returned to the agency after being unhappy with her treatment by her employer. On another occasion, Ms. Eusebio witnessed a woman attempting to procure extra food by lowering a rope out a window to a restaurant that operated from the first floor; when the agency boss observed this attempt at getting extra food, the woman was slapped, punched, and kicked.

11.     On May 7, 2006, Ms. Eusebio was placed with Hana Hammad ("Hammad"), her fourth placement in Jordan. Hana Hammad is the mother of defendant Nana Assaf. Upon information and belief, Hammad is a citizen of the United States of America.

12.     Ms. Eusebio worked for Hammad as a domestic worker for several months in Jordan and was paid $150 USD a month. Ms. Eusebio sent most of this money to the Philippines

3

to pay for food and school fees for her children. $150 split between her four children worked out

to $37.50 per child per month, or approximately $1.25/day.

## II.  Hammad and the Assafs convince Ms. Eusebio to work for the Assafs in the United States, 2006

13.  In summer 2006, the Assafs and their three children (ages approximately 8, 10,

and 12 at the time) visited Hammad in Jordan on a vacation. The Assafs stayed at a house

owned by the Assafs. At Hammad's direction, Ms. Eusebio worked for the Assafs during the

Assafs' visit to Jordan.

14.  In fall 2006, Hammad and the Assafs determined that the Assafs would like to

have Ms. Eusebio work as a domestic servant for them in the United States.

15.  Hammad informed Ms. Eusebio that if Ms. Eusebio were willing to travel to the

United States and work for the Assafs, the Assafs would pay her $300 USD a month. This was

double what Ms. Eusebio was being paid in Jordan

16.  Ms. Eusebio agreed to work for the Assafs in the United States for a 2-year term

and to be paid $300 USD a month.

17.  Hammad arranged for Ms. Eusebio to receive a B-1 visa to allow Eusebio to enter

the United States. B-1 visas are available for "[p]ersonal or domestic employees who

accompany or follow to join U.S. citizen employers who have a permanent home . . . in a foreign

country and who are visiting the United States temporarily" in cases where the "employer-

employee relationship existed prior to the commencement of the employer's visit to the United

States." 9 FAM 41.31 N9.3-1.

18.  Ms. Eusebio was required to attend an interview at the U.S. embassy in Jordan in

order to obtain a B-1 visa. Hammad directed Ms. Eusebio to tell U.S. immigration officials that

Hammad was traveling to the United States for surgery and that Ms. Eusebio would be

accompanying her. These statements were not true. Hammad also instructed Ms. Eusebio not to tell embassy personnel how much she would be paid in the United States.

19.     Ms. Eusebio was not comfortable lying, but she believed she needed to follow her employer's instructions. She therefore told embassy officials the story made up by Hammad.

20.     Ms. Eusebio was granted a six-month visa allowing her to travel to the United States accompanying Hammad.

21.     Hammad told Ms. Eusebio that the visa she had been issued was a visitor's visa. Ms. Eusebio asked Hammad if she would get in trouble in the United States for working when she was on a visitor's visa. Hammad told Ms. Eusebio that she would not get in trouble so long as she did not say anything to anyone.

22.     Some time later, Ms. Eusebio told Hammad that she had heard about people working in other countries without papers getting deported and then being unable to travel to other countries. Hammad assured Ms. Eusebio that that would not happen to Ms. Eusebio so long as she kept quiet.

23.     Ms. Eusebio traveled from Jordan to Chicago on November 7, 2006. Hammad remained behind in Jordan.

24.     Following Hammad's instructions, Ms. Eusebio told customs officers that Hammad had had an emergency that detained her from traveling to the United States, but that Hammad would soon be arriving in the United States for her surgery.

**III.     Ms. Eusebio works for the Assafs, 2006-2008**

25.     Ms. Eusebio was met at O'Hare International Airport by the Assafs. She then accompanied them to their home in Palos Park to begin work as their domestic servant.

26.     The Assafs took Ms. Eusebio's passport and visa from her. Ms. Eusebio did not protest because all of her employers in Jordan had always held her passport and she assumed she had no choice but to give them her passport

27.     Ms. Eusebio lived in the Assafs' home for the Assafs' convenience.

28.     Ms. Eusebio's work in the United States for the Assafs was much more intense than her work for Hammad in Jordan had been because she now had considerable childcare duties in addition to working as a housekeeper.

29.     On a typical day, Ms. Eusebio awoke at 6 a.m. and prepared breakfast and lunches for the three Assaf children, who left for school at 7 a.m. She then cleaned the house, vacuuming the house and mopping the floor every day. She was also responsible for washing the Assafs' car, cleaning the garage, and doing yard work. When the children returned home from school, she prepared snacks for them. She then prepared dinner for the family and cleaned up after dinner. On a typical day, she continued working until all of the Assaf family had gone to bed, around 10 p.m.

30.     On a typical day working for the Assafs, Ms. Eusebio worked 14-16 hours.

31.     From November 2006 until September 2007, Ms. Eusebio worked seven days a week for the Assafs.

32.     Beginning in September 2007, Ms. Eusebio was given Sundays off to allow her to attend the Kingdom Hall of Jehovah's Witnesses and visit with friends she met there. However, Ms. Eusebio was still expected to work when she returned home on Sunday evenings.

33.     Because of her heavy workload with the Assafs, Ms. Eusebio sometimes thought of running away, but she had no money, did not know where she could go, and needed a continuing source of money to send to support her children.

6

34.    In February 2008, Ms. Eusebio's heavy workload became even heavier when
Nana Assaf had a baby. After February 2008, Ms. Eusebio was also expected to care for the
newborn.

35.    From November 2006 until the end of 2008, the Assafs paid Eusebio $300 USD a
month in cash.

36.    Ms. Eusebio sent most of the money she was paid by the Assafs to the Philippines
via Western Union in order to support her children.

37.    Because Ms. Eusebio was so poorly paid and because she sent most of the money
she was paid to the Philippines to support her children, Ms. Eusebio had very little money to
spend on herself.

IV.    **The Assafs convince Ms. Eusebio to continue working for them, 2008-2009**

38.    Ms. Eusebio's two-year commitment to working with the Assafs should have
ended at the end of 2008. At that time, Ms. Eusebio wished to return to the Philippines, but she
had not saved enough money to allow her to support herself and her children when she returned
to the Philippines.

39.    The Assafs had not paid Ms. Eusebio enough money to return to the Philippines,
and Ms. Eusebio requested that she be allowed to work outside their home. The Assafs told Ms.
Eusebio that she could not work for anyone else. Ms. Eusebio believed that she was on a tourist
visa, and she accepted the Assafs' assertion that her only viable option was to stay with them.

40.    One of Ms. Eusebio's friends told Ms. Eusebio that she could make more money
working for someone besides the Assafs, in the range of $1000 a month. Eusebio explored the
possibility of working for a Filipino woman who was willing to pay her $800-$1000 a month.

41.     In November 2008, Eusebio informed the Assafs that, with her two-year commitment to the Assafs ending, she would like to go work for the Filipino woman who would pay her $800-$1000 a month. She asked them to return her passport to her.

42.     In response, Nana Assaf told Ms. Eusebio that because Hammad's name was on her visa, Ms. Eusebio was the Assafs' responsibility and the Assafs could not let her work for anyone else in the United States. Nana Assaf told Ms. Eusebio that Ms. Eusebio had only two options: continue working for the Assafs or return to the Philippines.

43.     Nana Assaf also told Ms. Eusebio that if Ms. Eusebio remained with the Assafs, the Assafs would hire her to work in one of their restaurants part time so that she could make additional money.

44.     The Assafs continued to hold Ms. Eusebio's passport even after Ms. Eusebio asked for it, telling her she could only have her passport if she was going to return to the Philippines.

45.     Because she still needed money to support her family, and because she believed based on Nana Assaf's statements that she could not work for anyone but the Assafs, Ms. Eusebio agreed to stay with the Assafs for another year, until March 2010.

46.     The Assafs never allowed Ms. Eusebio to work in their restaurants.

47.     Ms. Eusebio's salary was raised to $400 a month starting in January 2009 and then to $500 a month in June 2009.

48.     In addition to her long hours, low pay, heavy workload, and lack of personal time, Ms. Eusebio was also the victim of repeated verbal abuse by the Assafs' teenage sons. The Assafs were aware that this verbal abuse had caused Ms. Eusebio to break down crying on

several occasions, but they did not discipline their sons for this behavior and the behavior continued.

**IV.     Immigration officials remove Ms. Eusebio from the Assafs' home.**

49.     On December 16, 2009, officials from Immigration and Customs Enforcement ("I.C.E."), responding to a tip, visited the Assafs' home and inquired about Ms. Eusebio's immigration status. When they learned of Ms. Eusebio's working conditions, Ms. Eusebio was removed from the Assafs' home. She has had no further contact with the Assafs. Ms. Eusebio now resides temporarily in a women's shelter.

50.     On information and belief, when ICE officials asked Nana Assaf for Ms. Eusebio's passport, they were told that Ms. Assaf did not have it because Ms. Hammad had taken the passport and locked it in a safe deposit box.

51.     Working with attorneys who took her case *pro bono publico*, Ms. Eusebio petitioned the United States Citizenship and Immigration Service ("USCIS") to be granted a T Visa. The T Visa is a type of visa created in 2000 by the Trafficking Victims Protection Act to allow victims of human trafficking to remain in the United States. In connection with this application, the United States Attorney for the Northern District of Illinois certified that Ms. Eusebio entered the United States as a victim of human trafficking. In November 2010, USCIS informed Ms. Eusebio that her T Visa application had been approved.

**FIRST CLAIM FOR RELIEF**
**The Federal Minimum Wage Law, 29 U.S.C. § 206**

52.     Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully set forth here.

53.     An employer-employee relationship existed between the Assafs and Ms. Eusebio.

9

54.     As Congress has found, "the employment of persons in domestic service in households affects commerce." 29 U.S.C. § 202(a).

55.     Between November 7, 2006 and December 16, 2009, Ms. Eusebio performed approximately 13,000-15,000 hours of work for the Assafs. For this work, the Assafs paid her approximately $13,000.

56.     During that time, she lived in the Assafs' home for the convenience of the Assafs.

57.     As a result of the Assafs' failure to pay her at or above the minimum wage rate ($5.15 per hour from November 2006 until July 24, 2007; $5.85 per hour from July 24, 2007 to July 24, 2008; $6.55 per hour from July 24, 2008 to July 24, 2009; and $7.25 per hour from July 24, 2009 until the end of her time with the Assafs), Ms. Eusebio suffered damages in excess of $75,000, in an amount to be determined at trial.

58.     Pursuant to 29 U.S.C. § 216, Ms. Eusebio is entitled to her unpaid minimum wages and an additional equal amount of liquidated damages, as well as payment of a reasonable attorneys' fee to be paid by the defendants, and costs of the action.

## SECOND CLAIM FOR RELIEF
### The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589 & 1595

59.     Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully set forth here.

60.     18 U.S.C. § 1589 provides that

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

61.     The Assafs knowingly obtained Ms. Eusebio's services by threatening serious harm to her. They led Ms. Eusebio to believe that she could be arrested and/or deported if she attempted to leave their employment. Being arrested or deported would have been a serious harm to Ms. Eusebio.

62.     The Assafs knowingly obtained Ms. Eusebio's services by threatening serious harm to Ms. Eusebio's children. The Assafs knew that Ms. Eusebio's children depended on her income for food and school fees. By bringing Ms. Eusebio to the United States and then convincing Ms. Eusebio that she could not work for anyone in the United States but the Assafs, the Assafs made it impossible for Ms. Eusebio to leave their employment without her children suffering serious harm in the form of lack of food and education. Thus, the entire time Ms. Eusebio was working for the Assafs in the United States, it was under the implicit threat that if she did not please the Assafs, her children would suffer serious harm.

63.     The Assafs knowingly obtained Ms. Eusebio's services by means of a scheme, plan, or pattern intended to cause Ms. Eusebio to believe that, if she did not perform such labor or services, she and her children would suffer serious harm, as described in the preceding paragraphs.

64.     The Assafs knowingly obtained Ms. Eusebio's services by means of abuse of the law. The Assafs plotted with Hammad to obtain a B-1 visa to allow Ms. Eusebio to enter the United States in violation of United States immigration law. At no time did the Assafs attempt to

11

bring Ms. Eusebio to the United States legally. Moreover, after Ms. Eusebio's six-month B-1 visa expired, the Assafs took no steps to regularize Ms. Eusebio's immigration status. Instead, the Assafs used Ms. Eusebio's immigration status as a means to manipulate Ms. Eusebio, telling her she could not work for anyone else and that she had no choice but to continue to work for them. The conduct described in this paragraph was an abuse of the immigration laws.

65.     As a result of the Assafs' conduct, Ms. Eusebio has suffered damages in an amount to be determined at trial.

66.     Pursuant to 18 U.S.C. § 1595, Ms. Eusebio is entitled to recover damages and reasonable attorneys' fees and costs incurred in this action.

### THIRD CLAIM FOR RELIEF
### The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1590 & 1595

67.     Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully set forth here.

68.     18 U.S.C. § 1590 provides that "Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of [18 U.S.C. ch. 77] shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. ch. 77 includes 18 U.S.C. § 1589, quoted in paragraph 59 above.

69.     As set forth herein, the Assafs recruited, harbored, transported, provided, and obtained Ms. Eusebio to provide labor and services to the Assafs.

70.     As set forth in the second claim for relief, the Assafs' behavior violated 18 U.S.C. § 1589.

71.     As a result of the Assafs' conduct, Ms. Eusebio has suffered damages in an amount to be determined at trial.

72.     Pursuant to 18 U.S.C. § 1595, Ms. Eusebio is entitled to recover damages and

reasonable attorneys' fees and costs incurred in this action.

## FOURTH CLAIM FOR RELIEF
### The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1592 & 1595

73.     Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully

set forth here.

74.     18 U.S.C. § 1592(a) provides that:

> Whoever knowingly destroys, conceals, removes, confiscates, or
> possesses any actual or purported passport or other immigration
> document, or any other actual or purported government
> identification document, of another person—
>
> (1) in the course of a violation of section 1581, 1583, 1584, 1589,
> 1590, 1591, or 1594(a);
>
> (2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or
> 1591; or
>
> (3) to prevent or restrict or to attempt to prevent or restrict, without
> lawful authority, the person's liberty to move or travel, in order to
> maintain the labor or services of that person, when the person is or
> has been a victim of a severe form of trafficking in persons, as
> defined in section 103 of the Trafficking Victims Protection Act of
> 2000, shall be fined under this title or imprisoned for not more than
> 5 years, or both.

75.     As set forth above, the Assafs confiscated or possessed Ms. Eusebio's passport

and other immigration documents to prevent or restrict or to attempt to prevent or restrict Ms.

Eusebio's liberty to move or travel, in order to maintain Ms. Eusebio's labor or services. On

information and belief, when ICE officials asked Nana Assaf for Ms. Eusebio's passport, they

were told that Ms. Assaf did not have it because Ms. Hammad had taken the passport and locked

it in a safe deposit box.

76.     Ms. Eusebio is or has been a victim of a severe form of trafficking in persons.

13

77.     As a result of the Assafs' conduct, Ms. Eusebio has suffered damages in an amount to be determined at trial.

78.     Pursuant to 18 U.S.C. § 1595, Ms. Eusebio is entitled to recover damages and reasonable attorneys' fees and costs incurred in this action.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment

79.     Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully set forth here.

80.     Ms. Eusebio conferred a benefit on the Assafs by working for them as a personal servant.

81.     The Assafs paid Ms. Eusebio far less than the prevailing market rate for her services.

82.     The Assafs thus obtained Ms. Eusebio's services for far less than the prevailing market rate.

83.     Allowing the Assafs to obtain the benefit of Ms. Eusebio's services without them paying Ms. Eusebio prevailing market wages would violate the fundamental principles of justice, equity, and good conscience.

84.     Allowing the Assafs to avoid paying Ms. Eusebio the prevailing market rate for her services would unjustly enrich the Assafs.

## SIXTH CLAIM FOR RELIEF
### Fraudulent Misrepresentation

85.     Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully set forth herein.

86.     The Assafs made several misrepresentations to Ms. Eusebio, including:

14

  a. That Ms. Eusebio would be arrested and deported if she left the Assafs'

employ;

  b. That there was no way for Ms. Eusebio to work legally in the United

States;

  c. That it is normal for a United States employer to hold an employee's

passport;

  d. That if Ms. Eusebio continued her employment with the Assafs, they

would let her work in one of their restaurants to earn extra money; and

  e. Concealing the fact that most workers in the Chicago area performing

tasks similar to those performed by Ms. Eusebio receive much higher wages and work in much

better conditions than the conditions that existed at the Assafs' residence.

87. The Assafs knew or consciously disregarded the falsity of these statements.

88. By these misrepresentations, the Assafs intended to induce Ms. Eusebio to work

for them for below-market pay.

89. Ms. Eusebio reasonably relied on the Assafs' misrepresentations and accepted

employment at below-market pay.

90. Ms. Eusebio suffered damages by being compensated for her services far below

the prevailing market rate.

### SEVENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

91. Ms. Eusebio repeats the allegations made in the preceding paragraphs as if fully

set forth herein.

92.     The Assafs' conduct of bringing Ms. Eusebio to the United States illegally, using her as their full time servant, paying her virtually nothing, and verbally abusing and allowing their sons to verbally abuse her was extreme and outrageous conduct.

93.     The Assafs either intended to cause Ms. Eusebio emotional distress or were recklessly indifferent to causing her emotional distress.

94.     Ms. Eusebio suffered severe or extreme emotional distress, including but not limited to feelings of helplessness, fear, fatigue, and despair

95.     Ms. Eusebio would not have suffered this emotional distress but for the Assafs' extreme and outrageous conduct.

## JURY DEMAND

Ms. Eusebio demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Eusebio demands judgment as follows:

1.     Compensatory and special damages in an amount to be proven at trial not less than $75,000;

2.     Unpaid wages, at prevailing market wages for housekeeping and childcare services, in an amount to be proven at trial not less than $75,000;

3.     Pre- and post-judgment interest;

4.     Reasonable attorneys' fees, costs, and disbursements; and

5.     Such other and further relief as this Court deems just and equitable.

Respectfully submitted,

MARICEL O. EUSEBIO


By:  /s/ Robert R. Stauffer
    Robert R. Stauffer (6192749)
    Adam C. G. Ringguth (6297519)
    JENNER & BLOCK LLP
    353 N. Clark Street
    Chicago, IL 60654-3456
    (312) 222-9350

*Attorneys for Maricel O. Eusebio*

DATED:  April 1, 2011

## CERTIFICATE OF SERVICE

I, Adam C. G. Ringguth, an attorney, certify that I served the foregoing **AMENDED**

**COMPLAINT** upon:

> Linda Babich, Esq.
> Brianna M. Sansone, Esq.
> AZULAYSEIDEN LAW GROUP
> 205 North Michigan Avenue
> Chicago, IL   60601

by having a true and correct copy thereof delivered via United Parcel Service, in an envelope

properly addressed and with paid shipping and handling charges, this 1st day of April, 2011.


                              /s/ Adam C. G. Ringguth
                              Adam C. G. Ringguth